**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 23-02784-EG |
| | Chapter 13 |
| Thomas Murray Hayes, | |
| | **ORDER DENYING CONFIRMATION** |
| Debtor(s). | **OF PLAN** |

THIS MATTER is before the Court on the motion of Thomas Murray Hayes ("Debtor") to avoid the judicial lien held by Morgan Malino ("Creditor") on Debtor's residence at 283 Sandpiper Drive in Mount Pleasant, South Carolina (the "Residence") pursuant to 11 U.S.C. §522(f) through his proposed Chapter 13 plan (the "Plan," ECF. No. 13). Creditor filed an objection to the Plan on the grounds that his judgment lien should not be avoided in its entirety because Debtor undervalued his Residence (ECF No. 12). The issue before the Court is not whether Judgment Creditor holds a valid judicial lien against Debtor's Residence or whether Debtor would be entitled to the exemptions he is seeking—the parties have stipulated to that. Rather, the dispute comes down to the fair market value of the Residence. Under the mathematical formula as set forth in 11 U.S.C. §522(f), Creditor's judicial lien would be avoided in full if the Court finds the value of the Residence to be $508,321.34 or less, but the lien would be preserved in full if the Court finds the Residence to be worth $947,500.10 or more. Any value in between would result in a partial reduction of Creditor's judicial lien proportionally.

The Court held an evidentiary hearing on January 10, 2024, at which both Debtor and Creditor were represented by Counsel. The Chapter 13 Trustee also appeared and indicated that the Plan as proposed is confirmable pursuant to 11 U.S.C. §1325, but it would not be confirmable if Creditor's objection was sustained. At the hearing, Debtor testified

1

as to the condition of his Residence and introduced the testimony of C. Douglas Harbin ("Harbin"), a real estate broker and broker-in-charge with Harbins Two, Inc., as an expert on value of residential real estate property.[1] According to Harbin's opinion, the current market value of the Residence in its present condition is $495,500.00. Creditor introduced the appraisal of Kelley Tant ("Tant") of Sass, Herrin & Associates, Inc. which, using a sales comparison approach, arrived at a value for the Residence in its current condition of $675,000.00.[2] At the conclusion of the evidentiary hearing, the Court took the matter under advisement.

This Court has jurisdiction over this contested matter under 28 U.S.C. §§157(b)(1) and 1334. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (K), and (L). After observing the demeanor and testimony of the witnesses and thoroughly reviewing the evidence presented and the parties' pleadings, the Court makes the following findings of fact and conclusions of law[3] and finds that the fair market value of the Residence as of the Petition Date is $560,000.00. Therefore, the Creditor's lien should not be avoided in its entirety, and the Plan is not confirmable.

---

[1] Creditor objected to Harbin's designation as an expert on the ground that he did not qualify as an expert to appraise property or as an appraiser. The Court overruled the objection and allowed Harbin to testify as an expert for purposes of providing a valuation of the Residence. *See In re Smith*, 267 B.R. 568 (Bankr. S.D. Ohio 2001) (court followed decisions holding that an experienced real estate broker may qualify as an expert for purposes of providing valuation testimony notwithstanding a lack of formal appraisal training).

[2] Debtor's counsel objected to the introduction of Tant's appraisal as it was only received the day prior to the hearing. The Court noted that Federal Rule of Bankruptcy Procedure 7026(a)(2) does not apply to contested hearings based on Bankruptcy Rule 9014(c), and Debtor would have the opportunity to cross-examine Tant on her appraisal. The Court further inquired whether Debtor was seeking a continuance, however, Debtor's counsel clarified a continuance was not being sought.

[3] To the extent that findings of fact include a conclusion of law, it is deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

Debtor filed for chapter 13 relief on September 14, 2023 (the "Petition Date"). Schedule A reflects Debtor's ownership of the Residence and estimates its value at $495,500.00. In Schedule C, Debtor claims a homestead exemption in the total amount of $140,900.00 pursuant to S.C. Code Ann. § 15-41-30(A)(1)(a), (A)(1)(b), and (A)(7). No objections to the claimed exemptions have been filed. The Residence is encumbered by a mortgage lien held by Mr. Cooper in the amount of $367,421.34 and a judicial lien held by Creditor.

On or about June 18, 2018, the Ki Hap Investment Corp. was granted a Judgment in Charleston County, South Carolina against Debtor in the amount of $281,000.00. Ki Hap Investment Corp. assigned the judgment to Creditor in October of 2021. Schedule D lists Creditor's amount of claim at $281,000.00; however, Creditor subsequently filed a proof of claim on October 19, 2023 asserting the total amount of its claim, with interest accruing since 2018, to be $439,178.76 (POC No. 6-1).

Debtor filed his first Chapter 13 Plan on September 27, 2023 (the "First Plan", ECF No.10). Section 3.4 (Lien Avoidance) of the First Plan seeks to avoid Creditor's lien in full and provides the following figures:

| Name of creditor and description of property securing lien | Estimated amount of lien | Total of all senior/unavoidable liens | Applicable Exemption and Code Section | Value of debtor's interest in property | Amount of lien not avoided (to be paid in 3.2 above) | Amount of lien avoided |
|---|---|---|---|---|---|---|
| MORGAN MALINO / KI HAP INVESTMENT CORP.<br>283 Sandpiper Dr.<br>Mt. Pleasant, SC 29464<br>TMS # 514-13-00-170 | $ 281,000 | $ 367,421 | $67,100<br>SC Code §15-41-30(A)(1)(a)<br>$67,100<br>SC Code §15-41-30(A)(1)(b)<br>$6,700<br>SC Code §15-41-30(A)(7) | $495,500 | $ 0.00 | $ 281,000 |

On October 25, 2023, Creditor filed a timely objection to the First Plan arguing that Debtor had significantly undervalued the real estate listed and that sufficient value existed in Debtor's Residence to satisfy a significant portion of Creditor's claim. The confirmation hearing on the First Plan was scheduled for December 7, 2023. On November 10, 2023, Debtor filed the pre-confirmation modified Plan along with a notice scheduling a confirmation hearing on the amended Plan for January 10, 2024. Creditor did not file a second objection. A hearing on the confirmation of the First Plan was held on December 7, 2023 as no parties sought to have it removed from the calendar. Debtor, his counsel, and Harbin were present along with the Chapter 13 Trustee, but Creditor was not present as he believed that the filing of the modified Plan and notice for a later confirmation date mooted the hearing on the First Plan.

The Plan, as modified, similarly seeks to avoid Creditor's lien in full and only changes the estimated amount of Creditor's lien as asserted in Creditor's proof of claim:

| Name of creditor and description of property securing lien | Estimated amount of lien | Total of all senior/unavoidable liens | Applicable Exemption and Code Section | Value of debtor's interest in property | Amount of lien not avoided (to be paid in 3.2 above) | Amount of lien avoided |
|---|---|---|---|---|---|---|
| MORGAN MALINO / KI HAP INVESTMENT CORP.<br><br>283 Sandpiper Dr.<br><br>Mt. Pleasant, SC 29464<br><br>TMS # 514-13-00-170 | $ 439,178.76 | $ 367,421.34 | $67,100.00<br>SC Code §15-41-30(A)(1)(a)<br>$67,100.00<br>SC Code §15-41-30(A)(1)(b)<br>$6,700.00<br>SC Code §15-41-30(A)(7) | $495,500.00 | $ 0.00 | $ 439,178.76 |

At the request of the Court, the parties filed a Joint Statement of Dispute (ECF No. 18) which set forth the following issues for the Court to decide: (1) whether the Creditor was required to file an objection to the modified Plan in order for his objection to be heard and (2) whether the plan complies with 11 U.S.C. § 1325 and properly avoids Creditor's lien pursuant to 11 U.S.C. §522(f).

At the hearing, Debtor introduced into evidence the Residence's county tax assessment as of August 24, 2023, indicating that the house was built in 1995, its total finished living area is 1919 square feet (with 3 bedrooms and 2 bathrooms), and assessing the 2022 market value of the property at $400,900.00. Debtor also introduced into evidence the testimony of Debtor and Harbin as well as Harbin's opinion letter confirming that upon inpsection of the Residence, taking into account all recent sales in the same neighborhood as the Residence, and adjusting those numbers to mirror the condition of the home, his opinion of the current market value in the present "as is" condition of the Residence is $495,500.00.

Debtor testified that he and his late wife purchased the Residence in 1997. Debtor is the director of a non-profit cat rescue and sanctuary for abused, abandoned, and stray

5

cats which he started with his wife and has operated out of the Residence since 2000. Over the years, they fostered and housed over 400 free-roaming cats, with as high as 150 cats living and 74 litter boxes present in the Residence at one time. Currently, 27 cats live in the Residence, and they share one litter box. Debtor described the residence as having an "overwhelming" odor despite the daily cleaning and sanitizing. As a result of the felines often spraying urine on the drywall or using the bathroom outside of their litter box, the smell has infiltrated through the flooring and drywall and permeates throughout the house. Debtor testified that two years ago, while trying to repair some damage to the drywall the cats had caused, he discovered that the framing and wood in the kitchen had termite damage. While Debtor does not believe that there is any ongoing termite infestation, there remains significant visible termite damage throughout the house. A couple of years ago, he was provided a wide-ranging estimate of between $100,000.00 to $200,000.00 for repairs; however, no contractor would provide him with a concrete written estimate because the full extent of the damage and repair costs could not be assessed without removing the sheetrock and flooring and exposing all the framing. According to Debtor, the house would have to be "gutted" and everything removed to its studs for the termite damage to be treated or to get a proper and firm estimate for the necessary repairs.

Debtor also testified that as a result of leaks from the roof prior to its replacement two years ago, there were some black mold issues on the second floor which required some of the insulation to be replaced. Since 1997, there have been no significant improvements to the Residence aside from the roof being replaced two years ago and Debtor replacing cabinetry in the kitchen and some of the drywall in various rooms throughout the house. He has also removed some of the flooring and, while some has been replaced, other areas

6

of the house remain exposed and flooring has yet to be properly installed. While he is not a contractor, the work he has done to the house over the past few years was done by himself but without any approval or inspection. Debtor described the condition of the Residence as requiring an extensive list of repairs to bring it to a good condition: ductwork and HVAC would need to be replaced because the cat odors cannot be removed otherwise, the drywall and framing would have to be replaced as a result of the cats crawling and scratching, all the flooring would have to be replaced, and the house would have to be chemically treated to remediate the odor issue. Debtor's opinion is that the estimate of $495,500.00 which Harbin reached is a fair value for his Residence.

Harbin testified that he has been a real estate broker for the past 44 years and has lived in the Charleston area for the past 46 years. He currently lives in Mount Pleasant, South Carolina and is the Broker-in-Charge of Harbin Two, Inc., a real estate agency located in Mount Pleasant which he started 35 years ago. A vast majority of his business is residential dwellings. For the past 15 years he has been valuing and selling residential properties for Chapter 7 trustees in the Charleston area and estimated that he has valued and/or sold approximately 900-1,000 properties in bankruptcy. The "close ratio" was 40% because properties involved in the bankruptcy cases are distressed properties that are harder to sell. When asked how he values property in a bankruptcy case, Harbin testified that—whether in a bankruptcy case or not—he uses a "broker price opinion," which involves a lot of research and employs different factors, not just comparables. To value a residence, in addition to reviewing comparables, he also analyzes trends, marketability, prices of houses on the market or under contract, and a variety of other factors which account for what a "willing and able buyer would pay for the property exposed to the market for a

7

reasonable period of time." Harbin stated that an appraiser, on the other hand, generally only takes into account the price for the sale of properties that have actually closed.

As to the Residence at issue in this bankruptcy, Harbin testified that he reached his opinion of the value by initially doing a computer search, conducting two onsite inspections, taking pictures and making notes, and then analyzing all these factors together. He described "Village at Herron Lake," the subdivision where the Residence is located, as a "very good" neighborhood located near the Ravenel Bridge leading into Charleston. The location of the Residence within the neighborhood is unusual because, despite being considered part of the Village at Herron Lake subdivision, the Residence is physically located outside of the signage marking the entrance to the neighborhood. In his opinion, the condition of the Residence is "poor to very poor." Harbin testified that there are some minor damages to the outside and internally there is significant damage "from the slab up"—the flooring, insulation, and molding, including visible termite damage. He described the first floor as "trashed." In his opinion, the property is marketable at a steep discount if someone chose to buy it in its current condition.

In arriving at his conclusion that the current market value of the property is $495,500.00, Harbin relied on his expertise dealing with contractors, the required demolition of the sheet rock throughout the house, and the need to remediate the smell from the cats, which would require chemical treatment and replacement of floors. He also analyzed the surrounding neighborhoods and took into account listings of what recently sold as well as expired listings. He finally adjusted the value of the value by discounting it by $200,000.00 for the needed repairs which, through his experience, he estimated would be required to bring the house back to "good condition."

Tant testified regarding the appraisal she prepared and that Creditor introduced into evidence. She has been an appraiser since 2016 and conducts approximately 250 appraisals a year—approximately 2,000 over the course of her career. Prior to this case, she never appraised a residence involved in a bankruptcy proceeding. In determining an appraised value of $675,000.00 for Debtor's Residence, she employed a "comparables sales approach", taking into account sales of comparables in the area that recently sold. The appraisal indicates that the Residence is 29 years old and has 2,635 square feet of "gross living area above grade" with four bedrooms and three bathrooms.[4] She described the condition of the house as "fair to poor." As indicated in her appraisal, she noted significant damage to the interior of the home, including missing flooring in various rooms, visible termite damage, and damaged and missing drywall in several rooms. According to her opinion, the "cost to cure" to bring the Residence to a livable condition is $100,000.00. She based that estimate on information Debtor had provided her concerning an estimate he had received at one time of approximately $100,000.00 to $150,000.00 to cure the damages—which estimate was made prior to any of the updates or work that he had done himself throughout the house. She reached out to some contractors regarding the duct work and flooring and received an estimate of $10,000.00-$15,000.00 for the HVAC, but she did not reach out to anyone regarding the termite damage and did not receive any concrete estimate regarding the smell remediation. Tant's appraisal is based on sales of comparables which are summarized below:[5]

---

[4] While the parties did not focus on the number of rooms or the square footage of the Residence or the comparables used during the questioning of the witnesses, the Court notes that there is a discrepancy between the square footage of the Residence and the numbers of bedrooms and bathrooms noted in the county tax assessment and Tant's appraisal.

[5] The information contained in the chart only contains the salient information; however, in reaching its decision, the Court took into account the entirety of the appraisal and the information contained therein.

9

|  | Comparable #1 | Comparable #2 | Comparable #3 | Comparable #4 | Comparable #5 |
|---|---|---|---|---|---|
| Sale Price | $810,000 | $703,000 | $835,000 | $685,000 | $700,000 |
| Price per square foot | $442.014 | $526.20 | $533.55 | $326.19 | $345.51 |
| Gross living area/Square feet | 1,832 sq. ft. | 1,336 sq. ft. | 1,565 sq. ft | 2,100 sq. ft | 2,026 sq. ft. |
| Distance from Residence | 0.28 miles N | 0.66 miles SE | 0.83 miles E | 2.15 miles NE | 2.00 miles E |
| Condition | Good | Good | Good | Fair[6] | Fair |
| Date of sale | 7/23 | 1/24 | 5/23 | 7/23 | 9/23 |
| Age | 66 | 33 | 38 | 34 | 46 |

## CONCLUSIONS OF LAW

**A. Creditor Was Not Required to File an Objection to the Modified Plan**

Debtor takes the position that while Creditor objected to the First Plan, he did not object to the modified Plan filed November 10, 2023, and no other objections were lodged to the amended Plan; therefore, the Plan should be confirmed. The first issue before the Court is whether the Creditor was required to file an objection to the modified Plan in order for his prior objection to be heard. Section 1323(c) of the Bankruptcy Code squarely addresses that point and provides:

> Any holder of a secured claim that has accepted or rejected the plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless the modification provides for a change in the rights of such holder from what such rights were under the plan before modification, and such holder changes such holder's previous acceptance or rejection.

11 U.S.C. §1323(c). Here, Creditor filed a timely objection to the First Plan, specifically as to the valuation of Debtor's Residence and the avoidance of its judicial lien in its entirety pursuant to §522(f). Debtor's amended Plan did not reflect any change in the valuation of the real estate nor the fact that Debtor proposed to avoid the entirety of Creditor's judicial

---

[6] Tant indicated that comparables #4 and #5 were considered "handy-man specials."

10

lien. The only change was to the amount of Creditor's lien, but the effect of its avoidance remained unaltered. As such, the Court finds that no new objection was required to be submitted by Creditor.

### B. The Plan Cannot Be Confirmed As It Improperly Avoids Creditor's Lien in Its Entirety

The second issue before the Court is whether the plan complies with 11 U.S.C. § 1325 and properly avoids Creditor's lien pursuant to 11 U.S.C. §522(f). Whether Creditor's judicial lien impairs Debtor's homestead exemption—in whole or in part—depends on the value of the property, which the parties dispute. Section 522(f) provides:

> **(f)(1)** Notwithstanding any waiver of exemptions but subject to paragraph (3), the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—
>
> **(A)** a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523(a)(5); or
> **(B)** a nonpossessory, nonpurchase-money security interest in any--
>   **(i)** household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;
>   **(ii)** implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or
>   **(iii)** professionally prescribed health aids for the debtor or a dependent of the debtor.
> **(2)(A)** For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of--
>   **(i)** the lien;
>   **(ii)** all other liens on the property; and
>   **(iii)** the amount of the exemption that the debtor could claim if there were no liens on the property;
>
> exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11

11 U.S.C. § 522(f).  Here, the senior mortgage lien on the Residence is $367,421.34 and the total amount of exemptions is $140,900.00.  Creditor's $439,178.76 judicial lien may not be avoided to any degree if the value of the Residence exceeds $947,500.10 and would be avoidable in its entirety if the value is determined to be less than $508,321.34.   Debtor has the burden of proof on each element of §522(f).  *In re Myers*, 631 B.R. 392, 394 (Bankr. D.S.C. 2021) (citations omitted); *In re Gucciardo,* 576 B.R. 297, 300 (Bankr. E.D.N.Y. 2017) (burden is on debtor to prove by a preponderance of the evidence the elements required to avoid a lien under Code section 522(f)); *In re JP Riggs*, 635 B.R. 1 (Bankr. D. Conn. 2021) (same).

A crucial factor Debtor bears the burden to prove is the value of the Residence.  For purposes of § 522, the Bankruptcy Code defines "value" as the "fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate."  11 U.S.C. § 522(a)(2).  While "fair market value" is not defined, the phrase generally has been interpreted to refer to "the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  *Rodgers, Powers & Schwartz, LLP v. Minkina (In re Minkina)*, 79 F.4th 142, 147 (1st Cir. 2023); *In re Levin*, 2020 WL 1987783 (Bankr. E.D.N.Y. Apr. 24, 2020); *Duly v. Dragone (In re Duly)*, 206 WL 2081921 (Bankr. D. Conn. July 5, 2006).

Courts have long held that valuation is "not an exact science."  *Levin*, 2020 WL 1987783, at *3.  "Because the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight in the opinion testimony

12

received based on its view of the qualifications and credibility of the parties' expert witnesses." *In re Smith*, 267 B.R. 568, 572 (Bankr. S.D. Ohio 2001). In bankruptcy cases where the court, acting as the fact finder, is faced with determining the value of a property and is presented with conflicting appraisals, the court has discretion in making its determination and "is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion of the value of the subject property after considering the appraisals and expert testimony." *Id*. at 572-73;*see also In re Myers*, 631 B.R. 392, 395 (Bankr. D.S.C. 2021) ("As finders of fact, bankruptcy courts should determine the best method of ascertaining value, based upon the evidence presented." (quoting *In re 3G Props, LLC*, 2011 WL 5902504, at *8 (Bankr. E.D.N.C. July 12, 2011))); *In re West,* 2020 WL 257368, at *5 (Bankr. N.D. Ala. Jan. 15, 2020)*; In re Gucciardo*, 576 B.R. 297 (Bankr. E.D.N.Y. 2017) ("In determining which appraisal figure to use for purposes of establishing value of exempt property, a bankruptcy court is not bound by any figure in particular, but merely guided by them all." (quoting *In re Hannigan*, 2005 WL 3275485, at *2 (Bankr. D. Ma. Oct. 3, 2005))). "A court must simply make the best educated guess based on the evidence before it. Even the opinions of experienced and licensed experts . . . are only as good as the assumptions upon which their opinions are build." *JP Riggs,* 635 B.R. at 13.

In valuing residential real property, the typical method used is the comparable sales method. *Levin,* 2020 WL 1987783, at *3; *Gucciardo*, 576 B.R. at 300 ("The Sales Comparison Approach, which analyzes sales of properties that are similar to the subject property, is the proper valuation method used to determine the value of the Property for the purposes of this motion."). In analyzing comparable sales relied on in appraisals, courts

13

often consider the timing of the comparable sales as well as the location, lot size, square footage, condition, and age of the property. *Levin,* 2020 WL 1987783, at *3.

The Court is now faced with valuations that are $179,500.00 apart. From the outset, the Court notes that burden rests on the Debtor to prove the value of the Residence. Courts have held that "'where there is a significant difference in value between a debtor's appraisal of a property and the secured creditor's appraisal of a property, the accuracy of the debtor's appraisal is called into question." *Gucciardo*, 576 B.R. at 300. Despite the significant difference in the valuation, neither party has presented the Court with reliable estimates of the costs to repair the significant damage, odor, and structural issues. The lack of concrete figures for any such repair is not due to either party's lack of trying to obtain any such estimate. Based on the testimony and evidence presented, it is because the extent of the terminate damage—or whether the termite infestation is ongoing—cannot be assessed unless the Residence is stripped down to its studs.

The Court does not place significant weight on the county tax assessment of $400,900 as it is based on 2022 figures and appears to rely on a lower number of bedrooms, bathrooms, and overall square footage than what has been noted in Tant's appraisal.[7] As to the testimony of both Harbin and Tent, the Court finds both witnesses to be credible and their valuations relevant. The two witnesses used different methodologies to arrive at the valuations for the Residence. Tant employed the "comparables sales approach," which has generally been used by bankruptcy courts to determine the value of residential dwellings in the context of §522(f). Harbin, on the other hand, used a "broker price opinion" which

---

[7] While the Court has no way of confirming the correct square footage of the Residence, based on the pictures attached to Tant's appraisal, it appears that the Residence has 4 bedrooms and 3 bathrooms—not 3 and 2 as noted in the county tax assessment.

14

considers various factors to determine what a "willing and able buyer would pay for the property exposed to the market for a reasonable period of time." The Court acknowledges that Harbin has been employed by Chapter 7 trustees for an extensive period to provide valuations, and he admitted during testimony that much of his experience is based on distressed sales in the chapter 7 context. The valuation of the Residence here takes place in the context of Debtor's bankruptcy, this is a Chapter 13 and the valuation is being provided pursuant to §522(f)—not a sale in a chapter 7 case pursuant to §363. While the Court does not draw the conclusion that the value would always be different under the two scenarios, it does bear emphasis that in a chapter 7 sale the trustee is often under pressure to liquidate the estate promptly to maximize the creditors' recoveries. Moreover, as Harbin testified, some of his experience is in the context of short sales, which could lead to a lower sale price than what a willing buyer would be willing to pay for a residence under different circumstances. Accordingly, based on the testimony presented, the Court finds that Harbin's valuation may tend to be lower than what the fair market value would be when neither seller nor buyer is "under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Moreover, while Harbin noted that he based his opinion on a variety of factors, no evidence was introduced to indicate what trends he relied on; what prices of houses on the market or under contract or expired listings he took into account; or what other surrounding neighborhoods he visited to reach the value provided to the Court.

Tant relied on a total of five comparables sales of homes which sold in close proximity and took place close in time to the Petition Date. The first three comparables are of homes in "good" condition and within a mile range of the Residence. Based on their

15

respective sizes, the average sale price per square foot was approximately $500.00. The other two comparables were for homes in "fair" condition within a 2.15 miles range of the Residence and the average sale price per square foot was approximately $336.00. Tant's valuation of $675,000.00 for the Residence was based on its "fair/poor" condition and included a cure cost discount of $100,000.00 to bring the residence to a "livable condition"—which implies that the house could sell for approximately $775,000.00 if the repairs were made. Based on her valuation, Tant's estimated price per square foot for the Residence would be $256.00 (as compared to $188 if Harbin's valuation were taken into account, or $295.00 per square foot based on the $775,000.00 figure considering repairs of $100,000.00). These figures tend to suggest that more than $100,000.00 in repairs are needed to remediate the extensive damages and bring the Residence close to a desirable condition for any buyer to be interested in purchasing it.

Aside from the calculations, which are purely based on somewhat of a "guessing game" as to what the Residence would sell for, the Court has reviewed the evidence before it, including the pictures of the property attached to Tant's appraisal which emphasize the uniqueness of the property. It is not often that a factfinder is faced with having to determine the value of property which has been used as a cat sanctuary over the past 24 years and has housed closed to 400 cats over time, sometimes over a hundred cats at one time, in a space of less than 2,700 square feet. The evidence before the Court and the testimony of the witnesses emphasized the rare situation presented, the very poor state of the house, and the undesirable living condition given the smell which has permeated through the walls and floors and would require extensive repair and treatment to remediate which the Court believes to be closer to or greater than $200,000.00, rather than the $100,000.00 discount

16

that Tant estimated for repairs. Based on the evidence presented, the Residence appears to be in such shape that the best option would be to sell it in "as is" condition and any buyer would most likely demolish it to then rebuild, which would lead to a greater discounted sale price. The Court, however, cannot overlook the real estate market in the Charleston area over the past year which has not reflected a decline in home values despite the recent interest rate hikes. Moreover, as Harbin testified, the Residence is in a "wonderful" neighborhood and very good subdivision very close to the Ravenel Bridge.

The Court carefully considered the expert opinion of Harbin, Debtor's testimony, Tant's appraisal in support of Creditor's position, the current housing market in the area, photographs and descriptions of the Residence, and obvious damage and repairs that are required. The Court finds the value of the Property to be $560,000.00.

## CONCLUSION

Based on the foregoing, Creditor's judicial lien would be avoided in part, with $51,678.66 continuing as a lien on the Residence. Accordingly, it is hereby ordered that the Plan does not comply with the requirements for confirmation pursuant to 11 U.S.C. §1325 and §522(f). Therefore, confirmation of the plan and any modifications considered for confirmation is **denied**. Debtor shall prepare and file an amended chapter 13 plan within ten (10) days from the entry of this order. If no such plan is timely filed, this case may be dismissed without further notice or hearing.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**01/17/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 01/17/2024